## PERKINS *v.* LANGMAID & als.

Prior to the passage of the act of June 26, 1845, no general law existed in this State for constituting a school district composed of inhabitants of, or comprising territory within, different towns.

The petition to the selectmen for a new district under the provisions of sec. 2 of that act, need not set forth the particular interest which the petitioners have in the subject; it is sufficient if it allege in general terms that they are interested.

It is no legal objection to the validity of the proceedings in constituting such district, that its boundaries, as established, are different from those prayed for — nor that other persons than the petitioners are included within its limits — nor that an entire district existing in one of the towns is taken as part of the

Perkins *v.* Langmaid.

new district — nor that a majority of the members of either of the old districts, the whole or a part of which is included within the new, were opposed to the measure.

A tax assessed for school-house purposes by the boards of selectmen of the towns in which the new district is situated, acting together as a joint board, is illegal. The assessment should be made under the provisions of sec. 3 of said act, and not of the act of July 2, 1845.

THE parties agree, for the purposes of the case, that the defendants were selectmen of the town of Chichester for the year 1853, and as such issued their warrant to the collector of taxes of that town, dated November 12, 1853, directing him to collect the taxes against the persons named in the list, among whom was the plaintiff, he being an inhabitant of that town. The list purported to be the list of the assessment of the school-house taxes for that year upon the ratable polls and estate of the inhabitants of the Chichester and Loudon Union School District, as made by said selectmen on the 5th of November, 1853, and the warrant described the assessment as made by the selectmen of Chichester. By virtue of the warrant and list annexed, the collector distrained the plaintiff's oxen for non-payment of the tax, and sold them at auction, and this action is brought to recover damages for these proceedings. The taxes contained in said list were in fact assessed upon the polls and estates of residents, and upon the taxable property of non-residents in what is called the Chichester and Loudon Union School District, by the selectmen of Chichester and Loudon, acting together as a joint board.

In relation to the organization of said district various proceedings were had between 1828 and 1852, with a view to establish a school district lying partly in Chichester and partly in Loudon, and comprising inhabitants of each of those towns. It is unnecessary to state those proceedings, as the question of the legal existence of said district turns upon the proceedings on the subject in 1852. Prior to that year the district had an organization as a legally established district, had schools, repaired the school-house, and performed all the functions of a school district.

In 1852 doubts arose as to the legality of its existence, and an application was made to the selectmen of said towns by some of the inhabitants of each of the towns residing within the limits of the district, an order of notice issued, a hearing had, and on the 31st of July, 1852, the selectmen, on this application and hearing, constituted a school district by the name of the Chichester and Loudon Union School District, by disannexing the territory described in the record of their doings, with the inhabitants living thereon, with their taxable property, from the school districts to which they then belonged, and uniting them in the new district. The portions of territory so united were described in the record of said selectmen by metes and bounds. The territory taken from the town of Chichester to form said district was not the same as defined and bounded by said record as that described in the petition, and the territory taken from Loudon was an entire district in that town. The petition to the selectmen to establish the new district was signed by a part only of the inhabitants within the limits of the district as established, and sets forth that the interest of the petitioners would be promoted by establishing the district. A part of the inhabitants of each of the old districts from which the territory was taken to form the new, protested against the proceeding, and a majority of the legal voters in the old district in Chichester, among whom was the plaintiff, opposed the formation of the new district, and presented a remonstrance in writing to the selectmen against the proceeding, while the petition was pending.

In 1851 the school-house which was used in the union district was repaired, and expenses to the amount of $161.98 incurred therefor. These expenses remained unpaid until 1853, and on the first day of October in that year a meeting of the Union district, as established by the proceedings in 1852, was called, and at the meeting a vote passed, " to raise $300 to defray the expense of the award of the school-house lot and the past and contemplated repairs of the school-house." The past repairs referred to were those made in 1851, amounting to said sum of $161.98.

It was agreed that if either party should desire to contest any fact stated in the case, or to prove any other that might, in the opinion of this court, be material, the case should be discharged, and the cause stand for trial.

*H. A. Bellows,* for the plaintiff.

I. The assessment of the tax by the selectmen of Chichester and Loudon, acting together as a joint board, was illegal. It should have been made by the selectmen of Chichester alone. Comp. Stat. 167, sec. 15 ; Laws of 1845, chap. 221, sec. 3.

The assessment is to be made by the selectmen of each town upon the polls, &c., of the persons residing in their respective towns, by assessing their due proportion, having regard to the entire inventory.

Selectmen may make a new invoice for the purpose of assessing a school-house tax.    Comp. Stat. 104, sec. 10 ; Laws of 1844, chap. 148, sec. 1.

II. The warrant describes the tax as made by the selectmen of Chichester, and there was no such assessment.

III. The tax voted October 1, 1853, was illegal, because the district, if legally constituted, had no power to raise money for repairs on the school-house made before its formation. Before 1852 it had no legal existence ; a mere voluntary association.

IV. By the proceedings in 1852 the district was not legally established ; because —

1. The petition shows no such interest in the petitioners as to give the selectmen jurisdiction.   It does not appear that the petitioners are inhabitants of the territory comprised in the limits of the new district, or have any legal interest in the matter. The jurisdiction must appear on the face of the petition.

2. The selectmen had no power to form a new district by uniting entire districts as they exist, but only to sever individuals from existing districts.

3. We contend they had power only to set off such individuals as petitioned for that purpose.

4. They cannot set off a district against the remonstrance of a majority of its inhabitants.

Perkins *v* Langmaid.

5. The union made by the selectmen was not in accordance with the petition, — territory embraced in the petition not being included in the district as established. This the selectmen had not power to do.

*Flint & Bryant,* for the defendants.

I. A concurrence of understanding and action between the respective boards of selectmen of Chichester and Loudon in assessing the tax, was indispensably necessary to a correct, equal and proper assessment.

Whether, under all the different provisions of the law, the two boards of selectmen should have acted jointly or severally, may be doubtful, and is in the first place to be determined by the court.

If the court hold that they should have acted jointly, then the *assessment* was in due form, and the omission to add, in the collector's warrant, that the selectmen of Loudon joined with the selectmen of Chichester, that being merely descriptive, and not essential, would not make the warrant materially defective.

But if the court hold that the selectmen of Chichester should make their assessment separately, then the warrant shows that they did make and adopt this assessment as their own and separate assessment; and the fact that the selectmen of Loudon concurred with and assisted them in making it, would no more vitiate the assessment than if they had employed a clerk or assistant to make the computations for them.

II. The petition states that the interest of the petitioners would be promoted by the granting of the petition, and we think that this is a sufficient allegation that the petitioners were interested. The statute does not require the interest to be of any particular kind, nor was it necessary to state in the petition in what manner the petitioners were interested. A proper petition being presented to the selectmen, they have jurisdiction of the whole matter, to form the district, or not, as they judge proper, and to make the district as large and as small as they think best, and that whether it embraces those only who petition for it, or those also who remonstrate against it.

It is entirely immaterial whether the petitioners are more or less numerous than those who remonstrate, as the law provides that the district shall be formed, if formed at all, by the selectmen, and not by a popular vote of the inhabitants. It is also immaterial whether the inhabitants set off into the new district and the territory on which they live constitute entire districts, or are " set off from existing districts," or belong to no district at all.

III. The vote to raise the tax was for a legal and proper purpose, and was a legal vote.

The court will not enquire into the legality or judiciousness of the contracts of the district, or whether the money was or was not expended to the best advantage.

This district was at least morally bound to pay for the repairs made to their school-house in 1851, and we think they were legally bound so to do ; that those who made the repairs, could, at law or in chancery, have compelled the district to pay for such repairs, or abandon to them the house or materials which they had so provided for the district. *Maysville* v. *Schultz*, 3 Dana 10 ; 3 U. S. Dig. 521, sec. 51.

The case then stands that the district has voted a tax for a legal purpose, and laid out the money for debts which they were morally and probably legally bound to pay, and in the school-house which they have and use they are enjoying the benefit of the very repairs for which this money was paid out.

Nothing but evil could result from holding such a tax to be illegal.

It is important that the condition of this district be settled and quieted, and that they may hereafter be able to pursue the even tenor of their way, without further molestation.

It would be exceedingly hard to make these defendants suffer on account of the disaffection of a few individuals, and it should not be done unless the law be such as absolutely to require it.

SAWYER, J. Prior to the revision of the statutes in 1842, no general law existed for uniting school districts in different towns,

and until the passage of the act of June 26, 1845, entitled "an act in addition to chap. 69 of the Revised Statutes," Comp. Stat. 167 ; none existed for annexing an inhabitant of one town to a district in another, nor for constituting a district composed of inhabitants of, or comprising territory within, different towns. Prior to these enactments the only mode of effecting either of these purposes was by special act of the legislature.

The provisions of the Rev. Stat., ch. 69, secs. 8, 9, apply only to the case of two contiguous districts, in adjoining towns, uniting for the support of schools from year to year, so long as they may agree ; their separate organization or districts being maintained and the proceedings of each in raising, assessing and collecting money for school-house purposes, as well as all other district purposes, being the same as before. The act of 1845, in addition to this chapter of the Rev. Stat., provides for the union of citizens of different towns in one school-district, in two modes ; first, under the first section, by disannexing an inhabitant of one town from the district in that town, and annexing him to a district in another town ; and secondly, under the second section, by creating a new district with boundaries crossing the town lines, and embracing territory and the inhabitants living upon it within different towns. Proceedings under the first section do not change the boundaries, or in any way modify the organization of existing districts ; their effect being merely to transfer the individual and his taxable property from one district to another ; treating him as a member of the district to which he is transferred, though continuing to live within the limits of the other.

The second section provides for uniting together citizens of different towns in one district, by the formation of a new district, embracing territory lying partly in each town. It declares that " the selectmen of two adjoining towns may, on petition of persons interested, form new school districts by the union of inhabitants of such towns, and may for this purpose set off individuals, with their taxable property, from existing districts and define the districts as formed, by metes and bounds."

If the district in question was legally established under either of the statutory modes of uniting together citizens of different towns for school purposes, it is manifest it must be under the provisions of this second section. We think the proceedings in 1852 were such as to constitute a substantial compliance with the requirements of that section.

It is objected, that it does not appear from the petition that the petitioners were interested, within the meaning of the word as used in the section, and that this should appear upon the face of the petition, in order to give the selectmen jurisdiction of the matter. But we think if it is necessary that the interest of the petitioners should be alleged, it sufficiently appears upon this petition. It is set forth in it that their interest will be promoted by establishing the new district. This could not be if they had no interest in the matter. The statute does not specify the nature of the interest intended, and the petition need not be more specific. It is here in substance alleged that they have an interest to be affected by the proceeding.

It is further objected, that the selectmen have power only to set off such persons as petition therefor, and to constitute such district as may be defined in the petition. The object of the act is to provide a more convenient method of forming such districts than by resorting to the legislature for a special act. Some such latitude of discretion as would be exercised by the legislature in such case is obviously proper to be given to the selectmen. The power is expressly limited, under the first section, to disannexing the petitioner only, and for the obvious reason that, being done for his accommodation, it should be only at his request. Under the second, the selectmen are to proceed upon the petition of persons interested, to form a new district and define its boundaries. This implies that they are to decide upon the question, where shall the boundaries be established, and consequently who shall be included within them. In establishing a new district, to include a greater or less number of the inhabitants, and embrace more or less of the territory of each town, the personal views of one or more individuals may be in

opposition to the public good. The difference in the phraseology of the two sections clearly indicates that while the action of the selectmen under the first is to be limited to the individual petitioning, under the second the wishes of individuals are to be made to yield to considerations of the general advantage.

Nor is the exercise of the power by the selectmen necessarily to be confined to the setting off a part only of the territory or inhabitants of the two districts. The union of an entire district in one town, with the whole or a part of the district in the other, is clearly within the spirit of the act. In such case it may be said, in the language of the act, that individuals are set off from the existing district, as well as in the case of setting off a part of its members. In either case they are severed and disannexed from the old corporate existence and annexed to the new. There is nothing in the terms of the act nor in the nature of the proceeding to require that any thing should be left of the old district, to keep up its separate existence.

It is also clear that the power of the selectmen is not made to depend upon the assent or dissent of a majority of either district. Such limitation is not expressed in the act, and it contains nothing to imply it.

The district, then, had a legal existence in 1853, when the vote was passed to raise the money. The defendants object that if the proceedings in 1852, establishing the district, were legal, yet the money was raised in part to defray the expense incurred in repairing the school-house in 1851, prior to the time when the district first had a legal existence, and that they had no power to raise money for that object. The expenditure was one which resulted to their use. By reason of it they had a school-house prepared for their accommodation. It is immaterial whether, in form, the money was raised to purchase a house prepared for their occupation, or to reïmburse the expense incurred in thus preparing it. It was clearly equitable that they should recognize the outlay of the $161.98, as made under their authority ; and they might properly raise money for the purpose of refunding the amount expended, as so much agreed

to be paid by them for the purchase of the house. This view is in accordance with the opinion of the court in *Harris* v. *School District in Canaan*, 8 Foster 58, and we see no reason to doubt its correctness.

The next question arises upon the proceedings in assessing the tax, and making out and committing to the collector the warrant and list under which he distrained and sold the plaintiff's property. Whether or not these proceedings were in conformity to law must depend upon the statutory provisions upon those subjects. The list and warrant were signed by the selectmen of Chichester alone, of which town the plaintiff was an inhabitant. There is no doubt that in this the proceeding was correct. However the assessment is to be made, the list and warrant are to be committed by the · selectmen of the several towns to the collectors of their respective towns. Laws of 1845, ch. 221, sec. 3 ; and ch. 223, sec. 2. The assessment is described in the list and warrant as having been made by the selectmen of Chichester alone. In fact, it was made by the selectmen of Chichester and Loudon, acting as a joint board, and so we understand it appears upon the record of the assessment. The enquiries then, upon this part of the case are — 1, was the assessment properly made by the joint board ? and 2, if not, does the recognition of the assessment contained in the list and warrant, as made by the selectmen of Chichester, cure the irregularity ?

By the third section of the act of June 26, 1845, it is declared that whenever a school district, composed of the inhabitants of different towns, shall vote to raise money for schoolhouse purposes, the clerk of the district shall notify the selectmen of the several towns of the amount of money to be raised, and that it shall be the duty of the selectmen of each town to assess upon the polls and estate of the persons belonging to the district within their respective towns, their due proportion of the sum so voted to be raised, having regard to the entire inventory of all the inhabitants of the district. Whether by the expression, " a district composed of inhabitants of different towns," as thus

used, is intended a district lying wholly in one town, to which an inhabitant of another has been annexed in the mode prescribed in the first section of the act, may admit of some doubt; but there can be none that it does refer to such district as may have been formed under the provisions of the second section. A new district, constituted by uniting together inhabitants of the two towns under the same organization, in the mode prescribed in that section, must be a district composed of the inhabitants of different towns, within the meaning of the third section. And money voted to be raised by such district must be assessed in the manner therein prescribed. That mode is by the separate action of the two boards of selectmen, each assessing upon the polls and estate of such members of the district as are inhabitants of their respective towns, the proportion of the whole amount to be paid by them, according to the ratio which their inventory bears to the entire inventory of all the members of the district in both towns. The sum to be assessed is at once ascertained by instituting the mathematical proportion. There is no occasion for the joint action of the two boards in any step of the proceeding, and the provisions of the section clearly indicate that none such is to be had.

It is difficult to perceive why the same mode of assessment might not be adopted in the case of an existing district to which an inhabitant of another town has been annexed. If there had been no further legislation on the subject it would probably be held that the legislature must have intended to include such district, as well as one organized under the second section, within the designation of a district composed of the inhabitants of different towns, and the provisions of the third section be considered as governing in both cases. But by the subsequent act of July 2, 1845, entitled an act in addition to ch. 71 of the Rev. Stat., Laws of 1845, ch. 223, a distinction would seem to be made between the two cases, for which it is difficult to assign any satisfactory reason. This act provides that all persons who may be severed from a district in one town and annexed to one in another, shall pay a just proportion for building, repairing or

purchasing school-houses in the districts to which they may be annexed, and that whenever such district shall vote to raise money, the clerk shall certify the vote to the selectmen of each town, and the selectmen shall form a joint board for the assessment of the tax.

It is clear, then, that by force of these acts the assessment in the case of a district in one town, to which an inhabitant of another has been annexed, must be by the joint board of the selectmen of the two towns; while, in the case of a district composed of the inhabitants of two towns, by establishing its boundaries so as to include territory and persons living upon it in two towns, the assessment must be made by the selectmen of each town separately assessing the proportion to be paid by the members of the district residing in their respective towns. It is unnecessary to inquire why the legislature have adopted these different modes of assessing the tax in the two cases. It is plainly so enacted, and there is an essential difference in the two modes of procedure. To some extent the assessors of taxes act judicially. Many of the questions arising in the course of the assessment involve the exercise of judgment, such as the additional per cent. to be raised to meet abatements; Rev. Stat., ch. 43, secs. 3, 4; making the assessment upon a new invoice or upon the one taken for the general purposes of taxation; Laws of 1844, ch. 148, sec. 1. It often occurs that questions of great difficulty and doubt arise in reference to the vote of the district to raise the money, and the copy of the record as certified to them by the clerk, and these must be determined by the assessors for the time, and their proceedings regulated accordingly. That the business of assessors as such consists in something more than mere mathematical computations, is very clear. The assessment is not completed until a record of the taxes assessed is made and certified by them. Rev. Stat., ch. 43, sec. 6. This constitutes one step in the process of assessing the tax, for it is the only legal evidence of the tax assessed, and it can constitute such evidence only when it purports upon its face to be an assessment by the board to which the law assigns that duty.

If the record of the assessment in this case purports to be an assessment by the joint board of the selectmen of the two towns, and is verified by their attestation as such, it cannot be regarded as an assessment by the selectmen of Chichester alone. The majority of these selectmen, to whose judgment the law refers the questions involved in the assessment, may have been in all of them overruled and controlled by their associates in the joint board.

Nor can the fact that the assessment is described in the list and warrant as made by them, supply the want of the proper record evidence of a legal assessment. The list and warrant, in order to constitute a justification of the proceedings in the distress and sale of the plaintiff's property, require to be supported by due proof from the proper record of the legal assessment. Without that they are of no validity, and the recitals contained in them cannot be substituted to supply the place of the record evidence of the assessment which the statute requires. If, therefore, the record shows the assessment to have been made by any other persons than the selectmen of Chichester, although it may appear that they acted in conjunction with them, it is a fatal defect, rendering the assessment void.

If neither party moves that the case be discharged under the provision contained in it for that purpose, judgment will be rendered in the Court of Common Pleas for the plaintiff, for such damages as he may have sustained by reason of the illegal seizure and sale of his oxen.